# In the United States Court of Federal Claims

No. 17-194

Filed: October 30, 2017*

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

|  |  |
|---|---|
| | * Associational Standing; |
| | * Breach of Contract; |
| AMERICAN BANKERS ASSOCIATION, | * Duty of Good Faith and Fair Dealing; |
| and WASHINGTON FEDERAL, N.A., | * Federal Reserve Act of 1913, Pub. L. No. |
| *Individually and on Behalf of All Others* | *  63-43, ch. 6, 38 Stat. 251; 12 U.S.C. §§ |
| *Similarly Situated,* | *  222, 226, 241, 247(a), 248, 261, 282, |
| | *  287, 289, 301–305, 321, 341, 391 |
| Plaintiffs, | *  (2012); 12 U.S.C. § 289 (2012 & Supp. |
| | *  III 2016); |
| v. | * Fixing America's Surface Transportation |
| | *  Act, Pub L. No. 114-94, 129 Stat. 1312 |
| THE UNITED STATES, | *  (2015); |
| | * Omnibus Budget Reconciliation Act of |
| Defendant. | *  1993, Pub. L. No. 103-66, 107 Stat. 312 |
| | *  (1993); |
| | * U.S. CONST. amend. V, Taking Clause. |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**Stephen J. Obermeier**, Wiley Rein LLP, Washington, D.C., Counsel for Plaintiff.

**Eric Peter Bruskin**, United States Department of Justice, Civil Division, Washington, D.C., Counsel for the Government.

## MEMORANDUM OPINION AND FINAL ORDER GRANTING THE GOVERNMENT'S MOTION TO DISMISS

**BRADEN**, *Chief Judge.*

In 2015, without any hearings, Congress enacted the Fixing America's Surface Transportation Act ("FAST Act") to provide $2.7 billion over five years for national transportation infrastructure and other related surface transportation issues that was signed by former President Obama on December 5, 2015. To help fund the, aptly named, FAST Act, Congress amended the

---

* On October 27, 2017, the court provided a sealed copy of this Memorandum Opinion and Final Order to the parties to redact any confidential and/or privileged information from the public version and note any editorial errors that required corrections. The parties had until October 30, 2017 to file proposed redactions and/or corrections. Neither party filed redactions. The court incorporated all appropriate corrections.

Federal Reserve Act of 1913, by substantially reducing the historic statutory six percent dividend paid to certain member banks on their Federal Reserve stock.

For the reasons discussed herein, as a matter of law, Washington Federal, N.A. ("Washington Federal"), individually and on behalf of other national banks similarly situated, have no contractual or statutory entitlement to a dividend at any specific rate nor a property interest in which to assert a Taking Clause claim under the Fifth Amendment to the United States Constitution. The remedy for the understandable grievances alleged in this case lies within the exclusive jurisdiction of the Congress.

## I.   FACTUAL BACKGROUND.[1]

### A.   The Federal Reserve Act.

On December 23, 1913, Congress enacted the Federal Reserve Act of 1913 ("the Federal Reserve Act"), Pub. L. No. 63-43, ch. 6, 38 Stat. 251 (codified as amended at 12 U.S.C. §§ 221–522), to establish the Federal Reserve System. Therein, a seven-member Board of Governors ("the Federal Reserve Bank Board") was established, including the Secretary of the Treasury and the Comptroller of the Currency, to set monetary policy through discount rates, reserve requirements, and open market operations, with advice about general business conditions from the Federal Advisory Council and twelve regional Federal Reserve Banks. *See* §§ 10–12, 14, 38 Stat. at 260–65 (codified as amended at 12 U.S.C. §§ 241, 247a, 248, 261, 353).

Each of the twelve Federal Reserve Banks has authority to exercise certain enumerated powers within its assigned geographic area and is governed by a nine-member board of directors that reports directly to the Federal Reserve Bank Board. *See* § 13, 38 Stat. at 254–56 (codified as amended at 12 U.S.C. §§ 301–305, 341). The Federal Reserve Banks also serve as deposit institutions for United States Treasury funds. *See* § 13, 38 Stat. at 265 (codified as amended at 12 U.S.C. § 391).

In addition, the Federal Reserve Act requires that all banks with national charters ("national banks") must become members of "the Federal Reserve System by subscribing and paying for stock in the Federal [R]eserve [B]ank," in an amount "equal to six [percent] of the bank's paid-up capital stock and surplus," at a price set at $100 per share. *See* §§ 2, 5, 38 Stat. at 252–53, 257 (codified as amended at 12 U.S.C. §§ 222, 282, 287). The Federal Reserve Act also allows banks with state charters to convert to national banks, with approval from a majority of shareholders and

---

[1] The facts discussed herein were derived from: the April 14, 2017 Amended Complaint ("Am. Compl.") and Exhibits ("Am. Compl. Exs. A–F"); the May 15, 2017 Government's Appendix ("Gov't App."), including the April 5, 2017 Declaration of Philip Jasienczyk, Vice President and Chief Financial Officer of the Federal Reserve Bank of San Francisco ("Jasienczyk Decl."); the May 24, 2017 Plaintiffs' Appendix ("Pl. App."), including: the May 3, 2017 Declaration of Roy Whitehead, Chairman of Washington Federal, Inc. ("Whitehead Decl."); the May 19, 2017 Declaration of Brent Beardall, Chief Executive Officer of Washington Federal, Inc. ("Beardall Decl."); and the May 22, 2017 Declaration of James Chessen, Executive Vice President and Chief Economist of the American Bankers Association ("Chessen Decl.").

the Comptroller of the Currency.  *See* § 7, 38 Stat. at 258 (codified as amended at 12 U.S.C. § 321).

The Federal Reserve Act also provides that

[a]fter all necessary expenses of a Federal [R]eserve [B]ank have been paid or provided for, the stockholders shall be entitled to receive an annual dividend of six [percent] on the paid-in capital stock, which dividend shall be cumulative.

§ 7, 38 Stat. at 258 (codified as amended at 12 U.S.C. § 289).

Since 1913, Congress has amended the Federal Reserve Act over 200 times, including by the Omnibus Budget Reconciliation Act of 1993, Pub. L. No. 103-66, 107 Stat. 312 (1993).  No change was ever made to the annual dividend rate of six percent.

Section 30 of the Federal Reserve Act, however, "expressly reserved" to Congress the right to "amend, alter, or repeal" the Federal Reserve Act.  *See* § 30, 38 Stat. at 275, renumbered § 31, Pub. L. No. 95-630, title I, § 101, 92 Stat. 3641 (1978) (codified at 12 U.S.C. § 226 note (2012) (Separability; Right to Amend, Alter or Repeal)).

**B.     In 2012, Washington Federal Was Rechartered As A National Bank And Joined The Federal Reserve System.**

Washington Federal, a federal savings and loan association in Seattle, Washington entered into discussions with representatives of the State of Washington and the Federal Reserve Bank of San Francisco ("FRBSF") in 2011 to learn about the application process to become a chartered bank.  Whitehead Decl. ¶¶ 9, 13, 21.[2]  Washington Federal was informed by state regulators "that chartering as a state bank would save Washington Federal nearly $1 million per year" in premiums and regulatory fees.  Whitehead Decl. ¶ 11.  As a federally-chartered savings and loan association, however, Washington Federal was more familiar with the regulators at the Office of the Comptroller of the Currency ("OCC") and believed that investors and prospective customers "perceived the OCC to be the 'gold standard[.]'"  Whitehead Decl. ¶ 12.

Washington Federal, however, was concerned about the requirement to subscribe to Federal Reserve Bank stock, "an illiquid, long-term asset" that cannot be traded, pledged as collateral, or used to acquire other investments.  Whitehead Decl. ¶ 18.  In addition, at that time, "the Federal Reserve was undergoing an unprecedented change to its own balance sheet, as it had attempted to stabilize the economy from the recession of the late-2000s by acquiring [certain assets] and debt and equity positions . . . as part of responding to the nation's financial crisis."  Whitehead Decl. ¶ 21.  In addition, balance sheet changes "materially increase[d] the potential risk of stock ownership in the Federal Reserve System."  Whitehead Decl. ¶ 21.  The Chief Financial Officer of Washington Federal was dispatched to contact the Federal Reserve Bank Board to confirm that the Federal Reserve Bank Board "retained the right to demand additional capital

---

[2] Mr. Whitehead was Washington Federal's Chief Executive Officer and Chairman of the Board of Directors.  Whitehead Decl. ¶¶ 2, 11.

infusions from member banks in the event of a national banking crisis," but he was assured that the Board had never done so.  Whitehead Decl. ¶ 21.

In the end, Washington Federal agreed to become a national bank and pay half of the par value of its Federal Reserve Bank stock to the Federal Reserve Bank, but was required to hold the remaining half in reserve, subject to call by the Federal Reserve Bank.  *See* 12 U.S.C. § 282 (2012). As a result, Washington Federal assumed a "double liability," *i.e.*, a capital call of double the stock's par value, or four times the amount that Washington Federal paid for Federal Reserve Bank stock.  Whitehead Decl. ¶¶ 20–21.

Nevertheless, Washington Federal elected to recharter as a national bank, because "based on . . . over one hundred years of precedent, . . . it was guaranteed a [six percent] return [by the Federal Reserve Bank] on its paid-in capital stock."  Whitehead Decl. ¶ 23.  In addition, the dividend income would defray the regulatory fees that Washington Federal would have to pay to the OCC—"a significant factor [in] recommending that the Board of Directors approve . . . conversion to a national bank."  Whitehead Decl. ¶ 23.

On September 24, 2012, the Washington Federal's Board of Directors unanimously approved of Washington Federal's conversion.  Whitehead Decl. ¶ 24; Whitehead Decl. Ex. A (9/24/12 meeting minutes).  Thereafter, Washington Federal submitted an application to the OCC to convert that was approved by the OCC on May 29, 2013.[3]  Whitehead Decl. ¶ 24.

On July 8, 2013, Washington Federal submitted an application to FRBSF to purchase Federal Reserve Bank stock, "in accordance with the provisions of the act of Congress approved December 23, 1913, as amended, and known as the Federal Reserve Act."  Whitehead Decl. ¶ 25; Am. Compl. Ex. A.

On July 17, 2013, the FRBSF's Director of District Accounting sent a letter to inform Washington Federal that

> We have processed your application to purchase 479,610 shares of Federal Reserve Bank Stock.  This letter is to advise you of the charge of $24,048,444.75 processed on July 17, 2013, for payment amounting to 50% of the par value of the shares of Federal Reserve Bank Stock, plus accrued dividends from July 1, 2013 to July 17, 2013.

\* \* \*

---

[3] Washington Federal's parent company, Washington Federal, Inc., also was required to apply to become a bank holding company.  Pl. App. at 025 (conversion application) ("[For parent companies other than Bank Holding Companies] Provide a copy of the parent company's application to become a bank holding company.").  The application to become a bank holding company was approved on June 5, 2013.  Whitehead Decl. ¶ 24.

> Additionally, dividends will be paid semi-annually on the last business day of June and December.  Dividends are paid at the statutory rate of [six] percent per annum, or $1.50 per share semi-annually.  Dividend payments are documented by an advice that will be mailed to you.

Am. Compl. Ex. B; Whitehead Decl. ¶ 27.

### C.    The Fixing America's Surface Transportation Act.

On December 4, 2015, Congress enacted the FAST Act.  *See* Pub. L. No. 114-94, 129 Stat. 1312 (codified in scattered sections of 5, 7, 12, 15, 23, 31, 42, and 49 U.S.C. (2012 & Supp. III 2016)).    The  FAST  Act  authorized  substantial  appropriations  for  surface  transportation infrastructure through fiscal year 2020.  *See, e.g.*, § 3016, 129 Stat. at 1479 (codified at 49 U.S.C. § 5338 (2012 & Supp. III 2016)).  To pay for this increased spending, in part, Congress required the Federal Reserve Banks, effective January 1, 2016, to decrease the dividend paid to member banks with total consolidated assets of more than $10 billion to a variable dividend rate equal to the  rate  of  the  10-year  Treasury  note  or  six  percent,  whichever  is  less.    *See* § 32203(a)(1)(A)(i), (b), 129 Stat. at 1739–40 (codified at 12 U.S.C. § 289(a) & note (2012 & Supp. III 2016)).[4]  Member banks with less than $10 billion in consolidated assets, however, would continue to receive dividends at a six percent annual rate.  *See* § 32203(a)(1)(a)(ii), 129 Stat. at 1740 (codified at 12 U.S.C. § 289(a)(1)(A)(ii) (2012 & Supp. III 2016)).

The FAST Act also capped the Federal Reserve surplus fund at $10 billion and required that any excess be transferred to the United States Treasury general fund.  *See* § 32202, 129 Stat. at 1739 (codified at 12 U.S.C. § 289(a)(3) (2012 & Supp. III 2016)).  This "increased the risk [of] a call on Washington Federal for additional capital."  Whitehead Decl. ¶ 34.

On December 4, 2015, Washington Federal had assets in excess of $10 billion and owned 479,610 shares of Federal Reserve Bank stock.  Am. Compl. ¶¶ 2–4.  The effect of the FAST Act was to decrease Washington Federal's dividend earnings from $1,439,304 in 2015 to $502,471.43 in 2016.  Am. Compl. ¶ 4.  If the dividend rate had not been changed, Washington Federal would have received semiannual dividend earnings of $719,775.00 and $720,230.75, or a total of $1,440,005.75, in 2016.  Whitehead Decl. ¶ 31.  In addition, Washington Federal's 2016 earnings were substantially reduced, as was capital available for commercial or consumer lending and other investments.  Whitehead Decl. ¶ 33.  Today, Washington Federal considers its Federal Reserve stock as a "dead asset," because it has "a below market return as well as Federal Reserve [Bank] 'double liability' risk, and [Washington Federal] still cannot sell or trade the stock."  Whitehead Decl. ¶ 36.

---

[4] At the time Congress enacted the FAST Act, the rate on a 10-year Treasury note was 2.304 percent.  Am. Compl. ¶ 47.

## II.    PROCEDURAL HISTORY.

On February 9, 2017, the American Bankers Association ("AB")[5] and Washington Federal (collectively "Plaintiffs") filed a Complaint in the United States Court of Federal Claims.  ECF No. 1 ("Complaint").  Count I alleged that the Government breached a "contractual obligation to pay a six percent dividend to Washington Federal and all other member bank[s]" with assets in excess of $10 billion.  Compl. ¶¶ 70–75.  Count II alleged that the Government violated the implied duty of good faith and fair dealing, by reducing the dividend rate paid to Federal Reserve Bank member stockholders, contrary to the reasonable expectations of Washington Federal and other similarly situated member banks.  Compl. ¶¶ 76–83.  Count III alleged that the Government violated the Taking Clause of the Fifth Amendment to the United States Constitution "by causing the Federal Reserve Banks to pay a dividend that is less than six percent," thereby "depriv[ing] Washington Federal and other member bank stockholders of the value of their investments in Federal Reserve Bank stock."  Compl. ¶¶ 84–92.

On February 16, 2017, the parties submitted a Joint Preliminary Status Report.  ECF No. 6.  On March 1, 2017, the court convened a Status Conference to discuss an efficient way to proceed.  On March 7, 2017, the court issued a Scheduling Order that established the briefing schedule.  ECF No. 14.

On April 7, 2017, the Government filed a Motion To Dismiss, pursuant to Rules of the United States Court of Federal Claims ("RCFC") 12(b)(1) and (6), and a Motion For Summary Judgment, pursuant to RCFC 56.  ECF No. 19.

On April 14, 2017, Plaintiffs filed an Amended Complaint that referred to the purchase of Federal Reserve Bank stock as a "subscription," changed some of the dates in the factual allegations, and added a breach of an implied-in-fact contract claim.  ECF No. 20 ("Am. Compl.").

On May 15, 2017, the Government filed a Motion To Dismiss The April 14, 2017 Amended Complaint ("Gov't Mot."), arguing that: 1) there was no express or implied contract between the Government and Plaintiffs, or, in the alternative, the Government had no contractual obligation to pay Plaintiffs a six percent dividend rate in perpetuity; 2) the Government had no duty of good faith and fair dealing, independent of a contractual relationship with Plaintiffs; and 3) Plaintiffs have no cognizable private property interest in a specific dividend rate or, in the alternative, the Government's actions did not effect a taking.  ECF No. 25; Gov't Mot. at 11–12.

On May 24, 2017, Plaintiffs filed a Response to the Government's Motion To Dismiss.  ECF No. 27 ("Pl. Resp.").  On June 22, 2017, the Government filed a Reply to Plaintiff's May 24, 2017 Response.  ECF No. 34 ("Gov't Reply").

On July 27, 2017, the court heard oral argument on the Government's May 15, 2017 Motion To Dismiss and Plaintiffs' May 24, 2017 Response ("TR 1–130").

---

[5] The court herein refers to plaintiff American Bankers Association as "AB" to distinguish it from the American Bar Association, known as the ABA.

## III.    DISCUSSION.

### A.    Jurisdiction.

The United States Court of Federal Claims has jurisdiction under the Tucker Act, 28 U.S.C. § 1491, to adjudicate "any claim against the United States founded either *upon the Constitution*, or any Act of Congress or any regulation of an executive department, or upon any *express or implied contract* with the United States, or for liquidated or unliquidated damages in cases not sounding in tort." 28 U.S.C. § 1491(a)(1) (2012) (emphasis added). The Tucker Act, however, is "a jurisdictional statute; it does not create any substantive right enforceable against the United States for money damages. . . . [T]he Act merely confers jurisdiction upon [the United States Court of Federal Claims] whenever the substantive right exists." *United States v. Testan*, 424 U.S. 392, 398 (1976).

To pursue a substantive right under the Tucker Act, a plaintiff must identify and plead an independent contractual relationship, Constitutional provision, federal statute, and/or executive agency regulation that provides a substantive right to money damages. *See Todd v. United States*, 386 F.3d 1091, 1094 (Fed. Cir. 2004) ("[J]urisdiction under the Tucker Act requires the litigant to identify a substantive right for money damages against the United States, separate from the Tucker Act[.]"). Specifically, a plaintiff must demonstrate that the source of substantive law upon which he relies "can fairly be interpreted as mandating compensation by the Federal Government." *United States v. Mitchell*, 463 U.S. 206, 216–17 (1983) (quoting *Testan*, 424 U.S. at 400). Plaintiff must also make "a nonfrivolous allegation that [he] is within the class of plaintiffs entitled to recover under the money-mandating source." *Jan's Helicopter Serv., Inc. v. F.A.A.*, 525 F.3d 1299, 1309 (Fed. Cir. 2008).

In a breach of contract case, "the money-mandating requirement for Tucker Act jurisdiction normally is satisfied by the presumption that money damages are available for breach of contract, with no further inquiry being necessary." *Holmes v. United States*, 657 F.3d 1303, 1314 (Fed. Cir. 2011). A "well-pleaded allegation" of an express or implied-in-fact contract "is sufficient to overcome challenges to jurisdiction." *Trauma Serv. Grp., Inc. v. United States*, 104 F.3d 1321, 1325 (Fed. Cir. 1997). In addition, it is well established that the "Taking[] Clause of the Fifth Amendment is a money-mandating source for purposes of Tucker Act jurisdiction." *Jan's Helicopter Serv.*, 525 F.3d at 1309 (citing *Moden v. United States*, 404 F.3d 1335, 1341 (Fed. Cir. 2005)).

For these reasons, the court has determined that it has jurisdiction to adjudicate Counts I, II, and III of the April 14, 2017 Amended Complaint, pursuant to RCFC 12(b)(1).

### B.    Standing.

#### 1.    Regarding The American Bankers Association.

##### a.    The Government's Argument.

The AB is not in privity of contract with the Government. Gov't Mot. at 15. Nor does the AB have standing to seek an adjudication of a Taking Clause claim, because the April 14, 2017 Amended Complaint does not allege a property interest or investment-backed expectation that was

adversely affected by the decreased dividend rates required by the FAST Act. Gov't Mot. at 16. Nor can the AB satisfy the requirements of associational standing. Gov't Mot. at 17–18. In addition, the April 14, 2017 Amended Complaint requests damages that run only to member banks, not the AB. Gov't Mot. at 17.

### b.  Plaintiffs' Response.

Plaintiffs respond that the AB should be afforded associational standing and allowed to represent member banks in this suit, because the individual contracts between member banks and the Federal Reserve Banks are similar or identical. Pl. Resp. at 47–48. Some sixty-six AB member banks have a contract with the Federal Reserve Bank, and each owns a different amount of Federal Reserve Bank stock, such that each suffered a different monetary loss. Chessen Decl. ¶¶ 4–7. But, each member bank experienced the same percentage reduction in dividend rates under the FAST Act. Pl. Resp. at 48. As such, the AB's breach of contract claim concerns questions of law that do not require an individualized, fact-intensive inquiry. Pl. Resp. at 48.

In the alternative, the court should defer ruling on the AB's standing, because Washington Federal seeks to establish a class action and there may be no need to reach the issue of the AB's standing. Pl. Resp. at 46. In addition, this issue can be adjudicated after additional discovery is conducted to determine the exact amount of financial harm suffered by each member bank. Pl. Resp. at 46–47.

### c.  The Court's Resolution.

"[S]tanding is a threshold jurisdictional issue." *Myers Investigative & Sec. Servs., Inc. v. United States*, 275 F.3d 1366, 1369 (Fed. Cir. 2002). The standing requirements, derived from Article III of the United States Constitution, also apply to the United States Court of Federal Claims. *See Starr Int'l Co. v. United States*, 856 F.3d 953, 964 (Fed. Cir. 2017) (quoting *Anderson v. United States*, 344 F.3d 1343, 1350 n.1 (Fed. Cir. 2003) (holding that the United States Court of Federal Claims, "though an Article I court, . . . applies the same standing requirements enforced by other federal courts created under Article III.")), *petition for cert. filed*, No. 17-540 (Oct. 11, 2017). Therefore, a plaintiff must establish "an injury-in-fact that is both fairly traceable to the challenged conduct of the defendant and likely redressable by a favorable judicial decision." *Figueroa v. United States*, 466 F.3d 1023, 1029 (Fed. Cir. 2006). In addition, the party invoking jurisdiction bears the burden of establishing constitutional standing. *See Myers Investigative*, 275 F.3d at 1369 (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992) ("[T]he party invoking federal jurisdiction bears the burden of establishing [its] elements.")).

The United States Supreme Court has held that an association may file a complaint on behalf of members, when three elements are satisfied: "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hunt v. Wash. State Apple Adver. Comm'n*, 432 U.S. 333, 342–43 (1977). An association fails to meet the third requirement, if either the claim asserted or the relief requested requires "individualized proof" as to each association member. *Id.* at 344. Specifically, where damages claims are alleged, the third *Hunt* element has "been understood to preclude associational standing when an organization seeks damages on behalf of

its members," but no monetary injury has been incurred by the association nor assignment of the damages claims by its members. *See United Food And Commercial Workers Union Local 751 v. Brown Grp., Inc.*, 517 U.S. 544, 554 (1996); *see also Warth v. Seldin*, 422 U.S. 490, 515–16 (1975) (holding that an association may not file a suit seeking damages on behalf of its members where the damages are peculiar to each member, requiring "individualized proof" of "both the fact and extent of injury").

Although the AB argues that the court should defer ruling on whether it has standing, the United States Supreme Court has held that, when a plaintiff's standing is challenged, "exercise of its power by a federal court would be gratuitous and thus inconsistent with the Art[icle] III limitation." *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 38 (1976).

In this case, the AB alleged that some sixty-six member banks have a contract with the Federal Reserve Bank, but each owns a different amount of Federal Reserve Bank stock and experienced different amounts of monetary loss, as a result of the implementation of the FAST Act. Nevertheless, the AB insists that individualized proof is not needed, because each member bank had an equal reduction in dividend receipts. It may be true that the net decrease in dividend receipts may differ, because each AB member purchased a different amount of stock when it joined the Federal Reserve System. But, the April 14, 2017 Amended Complaint did not allege that the AB suffered individual monetary injury nor did it allege that any member bank assigned to the AB the right to recover damages on their behalf. *See Warth*, 422 U.S. at 515–16 (holding that associations lack standing in a suit for damages, when they are not incurred "in equal degree" by all members and require individualized proof).

For these reasons, the court must and has determined that the AB does not have standing to seek an adjudication of the claims alleged in the April 14, 2017 Amended Complaint. *See Rothe Dev. Corp. v. Dep't of Def.*, 413 F.3d 1327, 1334 (Fed Cir. 2005) ("[S]tanding is to be determined as of the commencement of the suit.") (citing *Lujan*, 504 U.S. at 570 n.5).

## 2. Regarding Washington Federal, N.A.

The United States Supreme Court has held that "the question of standing is whether the litigant is entitled to have the court decide the merits of the dispute or of particular issues." *Warth*, 422 U.S. at 498. Specifically, "a plaintiff must show [that] it has suffered an 'injury in fact' that is . . . concrete and particularized and . . . actual or imminent, not conjectural or hypothetical; . . . the injury is fairly traceable to the challenged action of the defendant; and . . . it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc.*, 528 U.S. 167, 180–81 (2000) (internal citations omitted). In determining whether a plaintiff has standing to pursue an action, the court "must accept as true all material allegations of the complaint, and must construe the complaint in favor of the complaining party." *Warth*, 422 U.S. at 501.

The April 14, 2017 Amended Complaint alleges that Washington Federal's dividends decreased from $1,439,304 in 2015 to $502,471 in 2016 or a $936,833 loss. Am. Compl. ¶ 4. That loss is concrete, particularized, and fairly traceable to the implementation of the FAST Act. In addition, that loss and subsequent financial injury can be redressed by a monetary judgment.

For these reasons, the court has determined that Washington Federal has standing to seek an adjudication of the claims alleged in the April 14, 2017 Amended Complaint.

C.   **The Amended Complaint Fails to Satisfy the Requirements of RCFC 12(b)(6).**

In this case, Counts I and II of the April 14, 2017 Amended Complaint, as previously described, allege all of the elements of a breach of contract case.  Am. Compl. ¶¶ 74–87.  Count III alleges that Plaintiffs had contractual and statutory rights to a six percent dividend, that are private property and subject to the Taking Clause of the Fifth Amendment to the United States Constitution.  Am. Compl. ¶¶ 88–96.

The parties have devoted a substantial amount of effort arguing about whether Washington Federal had a contractual relationship with the Federal Reserve Bank and, if so, whether Congress can change the terms of that contract by legislation.  In the court's judgment, the parties overlooked the dispositive fact that section 31 of the Federal Reserve Act states: "The right to amend, alter, or repeal this act is hereby expressly reserved."  Pub. L. No. 63-43, ch. 6, § 30, 38 Stat. at 275 (1913), renumbered § 31, Pub. L. No. 95-630, title I, § 101, 92 Stat. 3641 (1978) (codified at 12 U.S.C. § 226 note (2012) (Separability; Right to Amend, Alter or Repeal)).

In short, the Federal Reserve Act conferred no right to Washington Federal or any other holder of Federal Reserve Bank stock to receive a dividend at any rate certain that Congress could not amend, change, or even eliminate.  *See Bowen v. Pub. Agencies Opposed to Soc. Sec. Entrapment*, 477 U.S. 41, 48–49, 54 (1986) ("*POSSE*") (holding that no right could be conferred by an agreement between the State of California and the Department of Health and Human Services concerning social security payments paid to certain state employees "beyond that in [the statute] itself").

The effect of an express reservation of rights has been "settled since the *Sinking-Fund Cases*."  *POSSE*, 477 U.S. at 53 (citing *Sinking-Fund Cases*, 99 U.S. (9 Otto) 700 (1879)).  In the statutes at issue in those cases, Congress reserved the power to amend, alter, or repeal—and exercised that power.  As the United States Supreme Court explained, "Congress not only retains, but has given special notice of its intention to retain, full and complete power to make such alterations and amendments as come within the just scope of legislative power."  *Sinking-Fund Cases*, 99 U.S. at 720.  That includes the "performance of contracts already entered into."  *POSSE*, 477 U.S. at 53–54 (citing *Sinking-Fund Cases*, 99 U.S. at 721).  The Federal Reserve Act does not reflect that Congress intended to abdicate the right to change the dividend rate; instead, Congress expressly reserved the right to amend, alter, or repeal any provision of the Act at will, including that of the dividend rate.

Nor does the Federal Reserve Act convey a contractual or statutory right to a six percent dividend.  *See Nat'l R.R. Passenger Corp. v. Atchison, Topeka & Santa Fe Ry.*, 470 U.S. 451, 467 (1985) ("Legislation outlining the terms on which . . . parties may execute contracts does not on its own constitute a statutory contract, but is instead an articulated policy that, like all statutory policies, is subject to revision or repeal.").  The United States Supreme Court has held that contracts, "including those to which a sovereign itself is a party, 'remain subject to subsequent legislation by the sovereign.'"  *POSSE*, 477 U.S. at 52 (quoting *Merrion v. Jicarilla Apache Tribe*,

455 U.S. 130, 147 (1982)). In this case, the fact that Congress did not change the dividend rate, despite amending the Federal Reserve Act over 200 times, is irrelevant: "[S]overeign power, even when unexercised, is an enduring presence that governs all contracts subject to the sovereign's jurisdiction, and will remain intact unless surrendered in unmistakable terms." *Merrion*, 455 U.S. at 148. Moreover, where Congress expressly reserves the right to amend, alter, or repeal legislation, such statutory text "is hardly the language of contract." *Nat'l R.R. Passenger Corp.*, 470 U.S. at 467. In this case, the dividend rate "simply cannot be viewed as conferring any sort of 'vested right' in the face of precedent concerning the effect of Congress' reserved power on agreements entered into under a statute containing the language of reservation." *POSSE*, 477 U.S. at 55.

Nevertheless, Washington Federal insists that the Government must pay damages to those who joined the Federal Reserve System, before the FAST Act was enacted. Pl. Resp. at 30 (citing *United States v. Winstar Corp.*, 518 U.S. 839, 871 (1996)). In the *Winstar* cases, the financial institutions that acquired failed banks specifically were allowed by federal regulation to use "the purchase method of accounting under which 'supervisory goodwill' resulting from the merger would be treated as satisfying part of the merged thrift's regulatory requirements." *Winstar Corp. v. United States*, 64 F.3d 1531, 1535 (1995) (en banc), *aff'd*, 518 U.S. 839 (1996). "Another incentive was the use of 'capital credits' that also could be counted toward the regulatory capital requirements." *Id.* Subsequently, Congress disallowed the use of these accounting methods to satisfy capital requirements. *Id.* at 1538. But, in the *Winstar* cases, the merger documents contained specific reference to "purchase method of accounting," "supervisory goodwill," and "capital credits," terms considered as "essential reliance." *See Winstar*, 518 U.S. at 868–69 ("'[The parties] were contractually bound to recognize the supervisory goodwill and the amortization periods reflected' in the agreements . . . . 'Such an agreement . . . is usually interpreted as one to pay damages if performance is prevented rather than one to render a performance in violation of law.'") (citing *Winstar*, 64 F.3d at 1541–42; RESTATEMENT (SECOND) OF CONTRACTS § 264 cmt. a (AM. LAW INST. 1981)). In this case, the July 17, 2013 Advice of Holdings contained no language about dividends or any dividend rate (Court Exhibit A) and the July 17, 2013 acceptance letter states only that dividends will be "paid at the statutory rate," which as of that date was "[six] percent per annum, or $1.50 per share semi-annually" (Court Exhibit B). And, after January 1, 2016, when the FAST Act's dividend changes became effective, Washington Federal received the "statutory rate" effective at that time.

When a complaint alleges that a plaintiff's private property has been taken without just compensation, the court first must determine whether the plaintiff has a cognizable property interest. *See Huntleigh USA Corp. v. United States*, 525 U.S. 1370, 1377 (Fed. Cir. 2008). If the plaintiff has a cognizable property interest, the court turns to whether the government action amounted to a compensable taking of that property interest. *Id.* at 1378 (quoting *Am. Pelagic Fishing Co., L.P. v. United States*, 379 F.3d 1363, 1372 (Fed. Cir. 2004)). But, if the plaintiff fails to demonstrate the existence of a cognizable property interest, "the court's task is at an end." *Am. Pelagic Fishing*, 379 F.3d at 1372.

Washington Federal's April 14, 2017 Amended Complaint asserts that it has a "private property interest[]" in "contractual and statutory rights to receive a six percent dividend on Federal Reserve Bank stock and in [Washington Federal's] capital investments in Federal Reserve Bank stock." Am. Compl. ¶ 90. If Washington Federal, however, had no contractual right to a six

percent dividend, *ipso facto* it has no property interest in a six percent dividend rate.  Assuming *arguendo* that the court concluded Washington Federal had a contractual right to a six percent dividend rate, the remedy for a breach of contract is damages; no taking can occur, so long as that remedy exists.  *See La Van v. United States*, 382 F.3d 1340, 1352 (Fed. Cir. 2004) ("This court has consistently reaffirmed . . . binding precedent[] [rejecting a Taking Clause claim where the plaintiff retains 'the full range of remedies associated with any contractual property right.']").  In other words, a taking of a contractual property right only occurs, if the remedy for vindicating that right by legal process is eliminated.  *Id.*; *see also Castle v. United States*, 301 F.3d 1328, 1342 (Fed. Cir. 2002) (holding that there was no taking of a contractual right where the governmental action "did not deprive the plaintiffs from a contractual remedy"); *Bailey v. United States*, 341 F.3d 1342, 1347 (Fed. Cir. 2003) (same).

Property interests are "created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law."  *Webb's Fabulous Pharmacies, Inc. v. Beckwith*, 449 U.S. 155, 161 (1980) (citing *Bd. of Regents v. Roth*, 408 U.S. 564, 577 (1972)).  But a "mere unilateral expectation or an abstract need is not a property interest entitled to protection."  *Id.*; *see also Zucker v. United States*, 758 F.2d 637, 639–40 (Fed. Cir. 1985) ("[C]ourts have consistently refused to give effect to government-fostered expectations that, had they arisen in the private sector, might well have formed the basis for a contract or an estoppel. . . . Such an 'expectation' does not rise to the level of 'property' protected by the taking[] clause.").

The Federal Reserve Act provides that, "[a]fter all necessary expenses of a Federal reserve bank have been paid or provided for, the stockholders shall be entitled to receive an annual dividend of six [percent] on the paid-in capital stock, which dividend shall be cumulative."  § 7, 38 Stat. at 258 (codified as amended at 12 U.S.C. § 289).  A cumulative dividend is one "that grows from year to year when not paid . . . [*i.e.*,] [i]f the corporation does not pay a dividend in a particular year or period, it is carried over to the next year or period and must be paid before the common shareholders receive any payment."  *Cumulative Dividend*, BLACK'S LAW DICTIONARY 580 (10th ed. 2014).  That the Act uses the term "entitled" in describing the relationship between the member banks and the dividend does not equate the dividend rate to a property right.  In 1913, Congress found that a six percent dividend was a "fair" return.[6]  But, in reserving the right to

---

[6] The policy underlying the initial six percent dividend rate is found in the Report of the Senate Committee on Banking and Currency:

> The policy of limiting the dividends . . . is based upon the theory that these great public utility banks are not intended to be merely money-making banks, but that they are guardians of the public welfare . . . [they] will also be charged with the duty of protecting the national gold reserve, protecting the national commerce, and transportation enterprises of the United States.  For this reason, these banks ought to have no other motive than the public welfare, and the moving policy of the banks should not be to earn as much dividends as the commerce of the country could endure, but to protect our national commerce and our national-banking system at a fair profit.

S. REP. NO. 63-133, at 10–11 (1913).

amend, alter, or repeal any portion of the Federal Reserve Act, Congress maintained the right to revisit that dividend rate. *See* § 30, 38 Stat. at 275 (1913), renumbered § 31, Pub. L. No. 95-630, title I, § 101, 92 Stat. 3641 (1978) (codified at 12 U.S.C. § 226 note (2012) (Separability; Right to Amend, Alter or Repeal)).  Thus, Washington Federal had only a "mere unilateral expectation" of a six percent dividend, "not a property interest." *Webb's Fabulous Pharmacies*, 449 U.S. at 161.

Finally, Federal Reserve Bank stock cannot be sold or transferred. *See* § 5, 38 Stat. at 257 (codified as amended at 12 U.S.C. § 287).  This in an important factor in determining whether Washington Federal had a property right to a six percent dividend since the United States Court of Appeals for the Federal Circuit has held: "[The] absence of crucial indicia of a property right [*i.e.*, the ability to assign, sell, or transfer that right], coupled with the government's irrefutable retention of the right to suspend, revoke, or modify [that right] compels the conclusion that [there was no] property right." *Am. Pelagic Fishing*, 379 F.3d at 1374.

For these reasons, the court has determined that, although Washington Federal had an expectation that it would continue to receive an annual six percent dividend on its Federal Reserve Bank stock, it did not have a cognizable private property interest subject to the Taking Clause of the Fifth Amendment to the United States Constitution.

In examining a motion to dismiss under RCFC 12(b)(6), the court must accept as true all of the allegations contained in a complaint, but is not "bound to accept as true a legal conclusion couched as a factual allegation." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (internal quotation marks omitted).  Washington Federal alleges that it had contractual and statutory property rights to a six percent dividend, and that the failure to pay dividends at that rate amounted to a breach of contract, or, alternatively, a taking of a compensable property interest under the Taking Clause of the Fifth Amendment to the United States Constitution.  The court has determined, however, that as a matter of law, Washington Federal, individually and on behalf of other national banks similarly situated, had neither a contractual, statutory, nor property right to a six percent dividend rate that would entitle it to relief.

## IV.    CONCLUSION.

For these reasons, the Government's May 15, 2017 Motion To Dismiss is granted; the April 14, 2017 Amended Complaint is dismissed.  The Clerk of the United States Court of Federal Claims is directed to enter judgment accordingly.

**IT IS SO ORDERED.**

s/ Susan G. Braden
**SUSAN G. BRADEN**
**Chief Judge**

13

# COURT EXHIBIT A

# Federal Reserve Bank of San Francisco

101 Market Street, MS 555
San Francisco, CA 94105

# ADVICE OF HOLDINGS OF FEDERAL RESERVE BANK STOCK

**Advice:**   28948

**Date:**   July 17, 2013

WASHINGTON FEDERAL, NA
425 PIKE ST
SEATTLE, WA 98101-2334

**325070980**

YOUR BANK HOLDS THE FOLLOWING NUMBER OF SHARES OF FEDERAL
RESERVE BANK STOCK:

| | |
|---|---:|
| Number of shares purchased on or after March 28, 1942: | 479,610 |
| Number of shares purchased prior to March 28, 1942: | 0 |
| Total Number of Shares: | 479,610 |
| Capital Paid In: | $23,980,500 |

_____
**Authorized Signature**
Richard Cabral
Director
District Accounting

NOT TRANSFERABLE OR NEGOTIABLE

# COURT EXHIBIT B

# Federal Reserve Bank of San Francisco
101 Market Street, MS 555
San Francisco, CA  94105

July 17, 2013

WASHINGTON FEDERAL, NA
425 PIKE ST
SEATTLE, WA  98101-2334

**325070980**

Dear Leo L. Clarke:

We have processed your application to purchase 479,610 shares of Federal Reserve Bank Stock. This letter is to advise you of the charge of $24,048,444.75 processed on July 17, 2013, for payment amounting to 50% of the par value of the shares of Federal Reserve Bank Stock, plus accrued dividends from July 01, 2013 to July 17, 2013. Please find the enclosed Advice of Holdings No. 28948 for 479,610 shares of stock in the Federal Reserve Bank of San Francisco.

As your bank is a new member of the Federal Reserve System, I would like to take this opportunity to highlight some important requirements concerning your Federal Reserve capital stock holdings.  Each member bank is required to subscribe to Federal Reserve Stock in an amount equivalent to 6 percent of its capital and surplus.  Although the par value of the stock is $100 per share, banks pay only $50 per share at the time of purchase, with the understanding that the other half of the subscription amount is subject to call at any time.

Additionally, dividends will be paid semi-annually on the last business day of June and December.  Dividends are paid at the statutory rate of 6 percent per annum, or $1.50 per share semi-annually.  Dividend payments are documented by an advice that will be mailed to you.

Further, Regulation I requires that member banks adjust Federal Reserve Stock holdings if changes occur in their capital and surplus.  If a change in capital and surplus (as reported in the quarterly report of condition) results in a change in the member bank's Federal Reserve Stock holdings requirement by 15 percent or 100 shares, whichever is lower, the bank must file an application to adjust its stock holdings promptly.

In addition, Regulation I requires that member banks file an application to eliminate any excess or deficiency in stock holdings promptly following the filing of the December 31 report of condition. A copy of Regulation I can be obtained from the Federal Reserve Board of Governors' web site at *www.federalreserve.gov.*

If you have any questions, please call Stephanie Tong at (415)974-3287.

Sincerely,

Richard Cabral
Director